IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 19, 2017 Session

**STATE OF TENNESSEE v. SAVANNAH HUMPHREY**

**Appeal from the Circuit Court for Montgomery County**
**No. 41400113       William R. Goodman III,[1] Judge**

_____

**No. M2016-02183-CCA-R3-CD**

_____

Defendant, Savannah Humphrey, was convicted of one count of aggravated child abuse and one count of aggravated child neglect for injuries sustained by the three-month-old victim while in Defendant's care. On appeal, Defendant challenges the sufficiency of the evidence and argues that the trial court erred in denying her motion for judgment of acquittal. Based upon our review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

Stephanie Ritchie Mize (on appeal) and Jeffry Grimes (at trial), Clarksville, Tennessee, for the appellant, Savannah Ellen Humphrey.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; John W. Carney, District Attorney General; and Kimberly S. Lund, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual and Procedural Background*

Defendant was indicted by the Montgomery County Grand Jury with one count of aggravated child abuse and one count of aggravated child neglect. The victim in this case was the three-month-old daughter of Defendant's cousin, Lelia Burke, whom Defendant

_____

[1] This case was tried before the Honorable Michael R. Jones. Judge Goodman, acting as successor judge, heard and denied the motion for new trial.

was watching while Ms. Burke was at work. Ms. Burke explained that she had grown up with Defendant and had been paying her to watch the victim for a couple of weeks prior to the incident in question. Defendant also cared for three or four other children, including her own young son and daughter.

On June 12, 2013, Ms. Burke dropped the victim off at the Defendant's apartment around 4:15 or 4:30 a.m. Ms. Burke stated that the victim had a "little sniffle" but was otherwise fine. Ms. Burke told the victim that she loved her and gave her a kiss before leaving for work.

Around 1:30 p.m., Defendant's neighbor, Ciara Jenkins, texted Defendant and asked to borrow a cigarette. Ms. Jenkins borrowed $5 from Defendant to buy cigarettes from the store near their apartments, ate lunch, and then met Defendant around 1:45 p.m. to smoke the cigarettes. Ms. Jenkins and Defendant went to the front porch of their apartment building to smoke. Ms. Jenkins described Defendant as acting normal and calm. Defendant said that she had fed the baby and put her down. Ms. Jenkins and Defendant spent about fifteen to twenty minutes smoking, talking, and using their phones—Ms. Jenkins was texting while Defendant was reading their horoscopes. During this time, Defendant's son was running up and down the interior hallway of the apartment building, knocking on the windows. Ms. Jenkins believed that he was trying to get Defendant's attention, but Defendant ignored him and continued using her phone.

When the women got up to go back inside, Ms. Jenkins saw Defendant's two-year-old daughter with the victim dangling in her arms. As Ms. Jenkins described it, the two-year-old was "pulling the baby." Ms. Jenkins said that the victim's head was back, and she knew the victim was unconscious. There was "spit up" on the victim. Defendant followed Ms. Jenkins into the hallway, grabbed the victim from her daughter, and told Ms. Jenkins to call 911. 911 received the call at 2:03 p.m.[2] While Ms. Jenkins was on the phone, Defendant put her daughter back inside the apartment, laid the victim on the ground, and began performing cardiopulmonary resuscitation (CPR). Ms. Jenkins described Defendant as appearing nervous, but she otherwise seemed to be performing CPR correctly. Ms. Jenkins denied ever touching the victim.

Officer Justin Doolittle of the Clarksville Police Department was the first to respond to the 911 call. When he arrived, Defendant and Ms. Jenkins were standing over the victim, who was gray in color and was not breathing. Defendant said that she had fed the victim and laid her down for a nap and that, when she checked fifteen minutes later, the victim had vomited. When Defendant cleared the vomit, she noticed that the victim was not breathing. Defendant began performing CPR, then ran out into the hallway and

---

[2] The recording of this call was played for the jury at trial and entered as an exhibit. However, none of the trial exhibits were included in the record on appeal.

asked a neighbor to call 911. Defendant told Officer Doolittle that the victim had been lying in a "small bassinet . . . like a child seat swing type deal," but Officer Doolittle did not see any vomit on the seat or anywhere around it. Even though the apartment was dirty, including broken eggs on the kitchen floor and overturned couch cushions, Officer Doolittle did not see any vomit on any rags or blankets in the apartment or anywhere on Defendant.

Michael Rios, an emergency responder with Clarksville Fire and Rescue, arrived soon after Officer Doolittle and saw Defendant performing CPR on the victim. He and his partner took over chest compressions and rescue breathing. The victim was pale, had no pulse, was not breathing, and showed no signs of life. After several minutes of CPR, the firemen briefly detected a pulse, but it quickly faded. They continued performing CPR until the paramedics arrived. Mr. Rios testified that he repositioned the victim's head by slightly tilting it to clear her airway. Mr. Rios testified that he did not see any signs of head trauma, but he was focused on the victim's breathing and pulse and could not see the back of her head.

Daniel Work and Daniel Cotterell, paramedics with Montgomery County Emergency Medical Services, responded to the scene while CPR was in progress. The victim had no pulse and was barely breathing. She was cool to the touch and cyanotic, or starting to turn blue. Mr. Work established an intraosseous line in the victim's tibia using a specialized drill and gave the victim epinephrine to stimulate her heart. He explained that an intraosseous line could infuse fluids and medicines into an infant's body faster than an IV. While the paramedics were working on the victim, Mr. Cotterell described the Defendant as just standing there, not frantic or worried, and able to answer questions when asked what happened. Defendant said that she fed the victim and laid her down and that the victim was not breathing when Defendant went back to check on her. The paramedics moved the victim to the ambulance where they intubated her and applied a cardiac monitor. The monitor soon began showing a heart rate, and the victim's skin started to "pinken up." On the way to the hospital, the victim began to breathe on her own and started to move her arms and legs.

Investigator Michael Ulrey, a homicide investigator with the Clarksville Police Department, responded to the scene because of the possibility that the child might die. He arrived after the ambulance had left. Investigator Ulrey spoke to Defendant, who identified herself as the child's babysitter. Defendant stated that when the victim was dropped off that morning, she had some congestion but otherwise appeared normal. Defendant stated that she tried to feed the victim and that the victim drank about two ounces from her bottle. Defendant then put the victim down for a nap. Approximately twenty minutes later, Defendant heard the victim coughing. When she checked on the victim, the victim had thrown up and was not breathing. Defendant stated that she grabbed the baby and ran into the hallway to get help from a neighbor. Defendant then

began performing CPR while the neighbor called 911. Investigator Ulrey pointed out that he did not see any vomit, and Defendant stated that it was concentrated on the victim.

Ms. Jenkins testified that she was present "for some of it" when Defendant spoke to law enforcement, though it is not clear if she was referring to Defendant's statement to Officer Doolittle or Investigator Ulrey. Ms. Jenkins heard Defendant say that she went inside to get the victim, that there was "spit up" on the victim, and "something about her baby choking." Ms. Jenkins testified that these statements were untrue and "clearly not what had happened." Ms. Jenkins was confused about why Defendant would hide the fact that her two-year-old daughter had the baby and that Ms. Jenkins was the first to discover that the baby was not breathing. Ms. Jenkins tried to communicate with Defendant after the incident by text message and Facebook, but Defendant did not have any answers. Ms. Jenkins admitted that she did not say anything to law enforcement at the scene because she was nervous, but she later provided a statement.

Ms. Burke received a phone call from Defendant's husband on the emergency line at her place of employment notifying her that the victim had stopped breathing. Ms. Burke became hysterical, and her supervisor drove her to the hospital. While in the car, Ms. Burke called Defendant. Defendant stated that when she laid the victim down for a nap, the victim started vomiting. Defendant stated that as she cleaned up the vomit, she noticed that the victim was not breathing. Soon after Ms. Burke arrived at the hospital in Clarksville, the victim was transferred to Vanderbilt Children's Hospital in Nashville. When Ms. Burke saw her daughter, she described the victim as lying very still with her hands jerking. The victim also had bruising on her head. Ms. Burke called Defendant again "because what they were telling me and what she was telling me was not the same thing." Defendant said that "she didn't do anything, that she would never hurt the baby."

Detective Tyler Barrett, a child advocacy detective with the Clarksville Police Department, was assigned to investigate this case. Detective Barrett had received information that the three-month-old victim was in stable but serious condition with a fractured skull, bleeding of the brain, and seizures. The day after the incident, Detective Barrett interviewed Defendant in his office, and portions of the recorded statement were played for the jury.[3] Detective Barrett also interviewed Ms. Jenkins and stated that he had no reason to believe that she was not telling the truth.

Detective Barrett collected Defendant's cell phone and provided it to Detective Debra Kolofsky for forensic examination. Detective Kolofsky found text messages between Defendant and Ms. Jenkins beginning at 12:59 p.m. on June 12, 2013. The last message in the exchange was sent by Defendant's phone at 1:42 p.m. in response to Ms. Jenkins's question about going out to smoke. At 1:46 p.m., Defendant sent a video to

---

[3] Again, none of the trial exhibits were included in the record on appeal.

Ms. Burke's phone that had been recorded at 12:45 p.m.; the video apparently showed the victim playing and appearing unharmed.[4] The 2:03 p.m. call to 911 was not made from Defendant's phone. Before 2:03 p.m., Defendant's phone records showed texting and web browsing. Then, there is a period of about seven minutes of no out-going activity from Defendant's phone. Defendant called Ms. Burke approximately four times starting at 2:14 p.m. and then received a call back from Ms. Burke at 2:23 p.m.

Defendant texted several people regarding the victim's condition. At 3:34 p.m., she texted someone named Aaron Mercer, stating that the victim had "aspirated and stopped breathing . . . while she was sleeping." Defendant also texted updates to Ms. Jenkins indicating that she did not know what had happened and did not know what to do. At 5:29 p.m., Defendant texted Ms. Burke asking for an update and stated, "I'm sorry, I don't know what to do; I feel horrible." The following day, Defendant texted the following to Ms. Burke at 12:41 p.m.:

> After thinking about everything that happened yesterday, [the two-year old] did pick her up. I went to tell [two of the other kids] to clean up and I heard [the victim] cry so I went in there and [the two-year old] was standing by the door with her. So maybe she accidently dropped her, but I got her and she calmed down. I played with her and she seemed fine; then a little while later I went to the bathroom and came back; she got fussy so I fed her and laid her down, and about 20 minutes later is when everything happened. I'm sorry; I should have remembered and told you. I just had so much going through my mind. I'm so sorry. I'm praying for you and her, and just know that I love you.

Defendant texted Ms. Burke again at 2:33 p.m., stating:

> I know. I'm sorry. I told them every day to leave her alone [especially] [the two-year old]. [I don't know] what else to say. I can't change it and now I have to live with it and so does she. It's all my fault. I would never hurt that baby. I understand from your side completely. I'm just so upset I let you and her down.

Sometime later, Ms. Burke again contacted Defendant for an explanation, and Defendant stated that the victim fell off of the bed while Defendant was in the bathroom.

Dr. Verena Brown, a child abuse pediatrician at Vanderbilt Children's Hospital, testified that she began treating the victim on June 13, 2013. The twelve-week old victim was in the intensive care unit in stable but critical condition. The victim had previously

---

[4] Like the other trial exhibits, this video is not in the record on appeal.

been on a ventilator but was breathing on her own by the time Dr. Brown saw her. The victim was not moving and largely unresponsive. The victim was having an increasing number of seizures, despite being given two different seizure medications. Dr. Brown spoke to Ms. Burke regarding the victim's medical history before examining the victim. The victim's medical history showed no issues since birth, and tests for various genetic and bleeding disorders, like leukemia, came back normal.

During Dr. Brown's examination of the victim, Dr. Brown noticed that the victim had petechial bruising, or tiny spot bruises, on her forehead. The victim also had a linear bruise on her upper right arm. Dr. Brown testified that it is rare to find bruises on a child that is not ambulatory because they cannot do anything to themselves to cause the bruises. Dr. Brown testified that the linear bruise would have been caused by something of that shape coming into contact with the victim's arm. Dr. Brown reviewed CT scans of the victim's head, which showed bilateral subdural hemorrhages, or bleeding beneath the outermost layer of the protective tissue surrounding the brain. The CT scan also showed bleeding within the victim's brain and a fracture to the right side of the victim's skull. An MRI of the victim's brain revealed portions that were dead or dying due to the lack of oxygen. Dr. Brown testified that this damage to the victim's brain was irreversible. An ophthalmological exam revealed numerous retinal hemorrhages where blood vessels supplying the victim's retinas had burst. Dr. Brown testified that a brain injury would cause symptoms immediately and would get progressively worse over time; however, the victim did not appear to display any symptoms in the video taken on Defendant's phone at 12:45 p.m.

Dr. Brown testified that the skull fracture would have been caused by blunt impact to the head. While it was possible that a two-year old dropping the baby could have caused the fracture, Dr. Brown opined that it was unlikely that either a two-year old or a four-year old would be able to drop the baby with enough force to cause the victim's severe brain injuries. According to Dr. Brown, "It would be very hard for . . . such a small child to pick up a child and drop them with such height and force to do that." Dr. Brown stated that the victim's injuries were caused not just by an impact but by a rotational force, which she described as "the brain essentially being hit back and forth inside the skull." Dr. Brown stated that these types of injuries would not result from a small everyday accident, like falling off of a bed or playing, but from something severe, like a car wreck. According to Dr. Brown, "if someone were to witness another person inflicting these injuries, that person witnessing would know that the baby was in danger of death." Dr. Brown concluded that the victim's injuries were non-accidental.

During the victim's treatment at Vanderbilt, her seizures became difficult to control, so the victim was eventually placed in a coma-like state for a few days to "give[] the brain a time to rest so it can maybe start the healing process." The victim stayed at Vanderbilt Children's Hospital for a total of two months. At one point during that time,

the victim returned home but was readmitted the same day due to increased seizures and continued hemorrhaging in her brain. Dr. Brown testified that the victim's brain would not grow at normal rate, causing her head to appear smaller than normal. The victim was diagnosed with cerebral palsy and will have significant developmental delays and continued seizures. The victim is essentially blind from the retinal hemorrhages.

At the time of trial, the victim was eighteen months old. According to Ms. Burke, the victim is like an infant in that she cannot sit up on her own or support her own head. The victim can neither walk nor crawl. The victim cannot feed herself, hold things in her hands, or talk. Ms. Burke testified that she takes the victim to Vanderbilt on a regular basis for treatment and that the victim becomes sick more easily. The victim continues to have seizures, uses a wheelchair, and will require constant care for the rest of her life.

The jury found Defendant guilty as charged of both aggravated child abuse and aggravated child neglect. The trial court imposed concurrent sentences of twenty years for each count. Defendant filed a motion for new trial, which was denied by the trial court on September 22, 2016. Defendant filed a timely notice of appeal.

*Analysis*

On appeal, Defendant argues that the evidence was insufficient to support her conviction for aggravated child abuse and that the trial court erred in denying her motion for judgment of acquittal made at the close of the State's case-in-chief. At oral argument, Defendant conceded that the evidence is sufficient to support her conviction for aggravated child neglect.

*I. Motion for Judgment of Acquittal*

Defendant argues that the trial court erred in denying her motion for judgment of acquittal made at the close of the State's case-in-chief. Specifically, Defendant argues that "[t]he evidence and testimony presented by the [S]tate did not satisfy the statutory requirements of aggravated child abuse in establishing that the actions of [D]efendant knowingly or intentionally caused injuries to the minor child." Defendant did not waive her motion by introducing proof after making the motion. *See Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007). However, "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." *State v. Thompson*, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000); *see also State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013). The trial court must view the evidence in the light most favorable to the prosecution and determine the legal sufficiency of the evidence rather than the weight of the evidence. *See State v. Collier*, 411 S.W.3d 886, 892 (Tenn. 2013); *State v. Adams*, 916 S.W.2d 471, 473 (Tenn. Crim.

App. 1995). Thus, this Court's review on appeal is the same as our review of the sufficiency of the evidence, which will be discussed further below.

## II. Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

A person commits the offense of child abuse when that person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." T.C.A. § 39-15-401(a). A person commits aggravated child abuse when "the act of abuse . . . results in serious bodily injury to the child." T.C.A. § 39-15-402(a)(1). "Serious bodily injury" includes injuries that involve a substantial risk of death, extreme physical pain, or protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. T.C.A. § 39-11-106(a)(34). "Serious bodily injury to the child" also includes "a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, [or] brain contusion." T.C.A. § 39-15-402(d). If the child is less than eight years of age, the offense of aggravated child abuse is a Class A felony. T.C.A. § 39-15-402(b).

Aggravated child abuse is a nature-of-conduct offense. *Dorantes*, 331 S.W.3d at 386 (citing *Hanson*, 279 S.W.3d at 276-77). In other words, "'the act of treating a child

in an abusive manner . . . must be knowing conduct.'" *Hanson*, 279 S.W.3d at 276 (quoting *State v. Ducker*, 27 S.W.3d 889, 897 (Tenn. 2000)). "[A] person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct . . . is aware of the nature of the conduct or that the circumstances exist." T.C.A. §§ 39-11-106(20); -302(b). Thus, "the evidence must be sufficient for a rational jury to have concluded, beyond a reasonable doubt, that the defendant was aware of the nature of [her] conduct when [s]he treated the victim in such a manner as to inflict injury, and that, in so doing, [s]he acted other than by accidental means." *Dorantes*, 331 S.W.3d at 386 (citing *Hanson*, 279 S.W.3d at 277). The defendant need not have known or intended that her conduct would inflict the resulting serious bodily injury. *See State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003).

In this case, Defendant does not dispute that the victim's various injuries—including the bleeding in and around her brain and eyes and the resulting blindness and cerebral palsy—qualify as serious bodily injuries. However, Defendant contends that "[t]here was no testimony or evidence that intentional injuries could have occurred to the child at the hands of the Defendant." Defendant claims that the testimony provided by Ms. Jenkins, "is unrefuted that the Defendant was NOT with the child at the time of injury." The State responds that the evidence is sufficient because the victim was in the sole care of Defendant at the time she sustained injuries that were classified as non-accidental by the treating physician. We agree with the State.

In the light most favorable to the State, the evidence indicated that, other than some slight congestion, the victim was healthy when her mother dropped her off with Defendant on the morning of June 12, 2013. A video recorded on Defendant's phone at 12:45 that afternoon showed the victim appearing unharmed and not displaying any symptoms of a severe brain injury. Around 1:42 p.m., Defendant went out to the front porch with Ms. Jenkins to smoke a cigarette, leaving the victim unsupervised inside of her apartment with the other children. The victim's injuries were discovered around 2:03 p.m. when Ms. Jenkins called 911. Dr. Brown testified that the victim's injuries were the result of blunt impact to the side of the victim's head and the application of a rotational force that caused her brain to "hit back and forth inside the skull." Defendant offered varying explanations for the injuries, including claiming that her two-year-old daughter dropped the victim. However, Dr. Brown testified that a child under four years of age would not be able to create the force necessary to inflict the array of injuries sustained by the victim and that, aside from a "horrible car accident," there was no explanation for the victim's injuries consistent with an accident.[5] Dr. Brown classified the injuries as non-accidental and testified that "if someone were to witness another person inflicting these

---

[5] Defendant is incorrect in her characterization of Dr. Brown's testimony, without any references to the record, as being "consistent with witness Jenkins['s] account of the baby dangling and being dr[agged] by the toddler child of the Defendant."

injuries, that person witnessing would know that the baby was in danger of death." Because Defendant was the only person capable of inflicting such injuries on the victim at the time they were sustained, it was reasonable for the jury to conclude that Defendant knowingly inflicted these injuries other than by accidental means. *See Hanson*, 279 S.W.3d at 278 (reinstating conviction for aggravated child abuse when medical experts determined that victim's injuries were non-accidental and victim was in sole custody of defendant at the time of injury); *State v. John Barlow*, No. W2008-01128-CCA-R3-CD, 2010 WL 1687772, at *9-10 (Tenn. Crim. App. Apr. 26, 2010), *perm. app. denied* (Tenn. Sept. 24, 2010) (holding evidence sufficient to sustain conviction for aggravated child abuse when victim suffered non-accidental brain injuries while in the sole custody of defendant). We affirm Defendant's conviction for aggravated child abuse.

*Conclusion*

Based on the foregoing, we affirm the judgments of the trial court.

_____
TIMOTHY L. EASTER, JUDGE